Good morning. May it please the court, my name is Matt Powell and I represent the petitioner here, California Pacific Bank. I understand that I have 15 minutes for argument. I would like to reserve three minutes for rebuttal please. The question this court will be asked to decide is whether the FDIC can use its internal manual as though it had the force and effect of law in order to find that California Pacific Bank violated the Bank Secrecy Act. As I will explain, the FDIC was able to exploit the vague provisions of the BSA by finding the procedures in the internal manual that the bank chose not to implement constituted violations of the BSA. I will also explain that the FDIC elevated its internal manual over the United States Code. The FDIC took the position that the bank was required to follow the directives in its internal manual despite being advised by the Department of Justice and the FBI that it should not disclose any aspect of the ongoing investigation. However, I would prefer to use my time to answer any  Sotomayor, let me ask you, because it seems like in your briefing you strenuously object to the FDIC's reliance on this manual as clarifying guidance, and you just repeated that right now, your assertion that it was too vague. I guess, isn't that manual entitled to deference? Are you asking us to ignore the manual completely? What's your — give me your best argument why we wouldn't give at least skid more deference to the manual. Your Honor, in this case, the Supreme Court has held that internal manuals like this one, excuse me, do not have the force and effect of law, and that they are not entitled to Chevron deference, and that's the Supreme Court's decision in Christensen. All that a manual like this is, is guidance. Now, it's entitled to some degree of respect, like any other guidance, like the guidance in any other well-reasoned treatise, but the fact that the bank chose not to follow specific procedures that are set forth in this 400-plus page FFIC manual does not demonstrate that the this is information that the bank can look at, the regulators can look at, but what the FDIC did here was to look at procedures in this 400-plus page manual that the bank chose not to implement, find violations of the BSA, rather than looking at what the bank was actually doing and had been doing for years that was sufficient to satisfy all four pillars of the BSA. The FDIC found that the manual was basically scattered all over your bank, that it was relied upon for Ms. Vivaldo, that provisions of the manual were identically transported into the bank's own in-house BSA policy. The bank had essentially adopted it, had it not? I would not go so far to say as the bank had adopted. Certainly, the bank considered the FFIC manual for guidance. It used the FFIC manual to help create its own BSA policy manual, and it is undisputed that the bank's independent examiner, Joan Vivaldo, considered the guidance in the FFIC manual. But the fact that they consider this as guidance does not mean that their failure to adopt particular provisions rises to a violation of the law. As again, this is a 400-page manual. It has numerous provisions in there. And the bank looked at some of those procedures, decided to implement some of them. For other aspects of its compliance with the Bank Secrecy Act, it used alternative procedures. The bank utilizes the manual for guidance. I understand your point there. But isn't that exactly the concept, that the Bank Secrecy Act is what controls and that the manual provides guidance as to how you comply with that act? The manual certainly provides guidance, but it doesn't say that the Bank Secrecy Act, in and of itself, is relatively short. It consists of four sentences. And therefore, you can't take the FFIC manual and say, that's what it means, its guidance. You have to look at what the bank is doing to comply with the BSA. What is the bank doing to establish the provision as internal controls? The FDIC's examiner in charge, Ms. Rollins, said that means, does the bank know its customer? Using that definition, it's undisputed that the bank knew its customers, and performed numerous procedures to make sure that it understood its customers. Those procedures constitute what the FFIC manual calls customer due diligence and enhanced due diligence, as well as suspicious activity monitoring. The procedures the bank performed, for example, reviewing the batch report, those don't appear in the FFIC manual, but those are extensive. It's a relatively small bank. It has 200 customers, 500 active deposit accounts. Every day, the bank looked at every transaction going through those deposit accounts. It reviewed those transactions against the background of knowing that most of its depositors, over 80 percent, also had credit through the bank. They were borrowers. So when you evaluate whether the bank's complying with the BSA, you can't look at procedures in the FFIC manual like, well, you have to wait over three months or you violated the BSA. Look at what the bank's doing. Look at the information the bank had. The bank, and this is why the record's so voluminous, I apologize for that, of these 16 customers, virtually all of them were depositors. Most of them, I'm sorry, I misspoke, virtually all of them were borrowers. Most of these customers had been customers of the bank for years, and the bank was intimately familiar with what they were doing and the nature of their business, and all of the information that the FDIC examiners said the bank didn't have, it in fact had. It just didn't have it in the way the FDIC said it should have had it, and more importantly, that information was not documented in the deposit files. The deposit files themselves did not contain extensive information, but the records that existed for these same customers were replete with information about their business, ranging from, I apologize. Counsel, Judge Gould with a question. So we review for substantial evidence, right? Your Honor, ordinarily, I would concede that would be the standard, but in this case, the question is substantial evidence of what? Substantial evidence that the bank was complying with the FFIC manual. Also against that background, and we've argued this, is you have to evaluate the bias that was manifested throughout this investigation. Prior to beginning the examination, the FDIC had determined that it would find violations of the BSA. During the course of the examination, the FDIC disregarded evidence demonstrating that the bank was complying with the BSA in favor of finding procedures in the FFIC manual that they did not adopt. We've pointed to the memo that was prepared mocking management to the bank that has racist overtones to it. And then finally, at the end of the examination, the bank changed the basis — I'm sorry, I apologize. The FDIC changed the basis for finding that the bank failed to file a suspicious activity report in order to find a violation of the BSA. So while under ordinary circumstances, in evaluating this particular regulatory investigation and the board's determination following that regulatory investigation, that the question would be, is it supported by substantial evidence? In this case, I believe the answer is no, because — Sotomayor, what's your best authority that this whole bias argument supports, that it rises to a level of a due process violation? In this case, Your Honor, as we concede in our brief, the case we cited says that generally bias in a regulatory investigation does not rise to due process violation. In this case it does because we identified the bias in the regulators. The ALJ and then the board decided that that bias was not sufficient to constitute due process violation, but then the entire decision of the ALJ and then later the board is based on the fact that we have to defer to what the FDIC examiners said. They have expertise in this area, and so the fact that they reached a conclusion that's — I understand your — what you're arguing and you're trying to have us question what happened. You're making an assertion here that it rises to a due level, due process violation. And I'm just trying to figure out what's your authority for that, other than your logic. Your Honor, we looked long and hard. I could not find a case that said that. This is something I think it's going to be somewhat of a matter of first impression, that can you have a situation where there's demonstrated bias, where the regulators are not determining whether the bank complied with the regulations but with their own manual, and then turning around and saying you have to give such deference to the bank examiners that whatever they've decided, that is sufficient to find violations. So when you have those two aspects of this, under those circumstances, we contend that here the bias of a regulator can rise to the level of a due process violation because the — for all intents and purposes, the administrative law judge and then the board found that they were the final adjudicators. What they decided, controlled. Counsel, was there any significance to the fact that regulators made certain recommendations about the Bank Secrecy Act procedures in an earlier exam report, and apparently those were not — their recommendations weren't followed? I think the significance, Your Honor, is that in the first examination, the examination in 2010, the FDIC examiners found that the BSA program at the bank was generally adequate. It then made a number of recommendations to improve the Bank Secrecy Act. The bank implemented all of those regulations, except one. Most of those recommendations were implemented to the satisfaction of the FDIC. The reports regarding currency transactions, other aspects of — or recommendations, I apologize, that the FDIC made were successfully implemented. There are three that are at issue. A risk assessment form for customers, a risk assessment evaluation for the bank, and the third provision that the bank should aggregate account information over three months. Only as to the third provision did the bank ultimately decide, this is something we don't feel we need to do because we have procedures in place that are sufficient. In fact, they're more extensive than what this would give us. This goes back to this review of these batch reports. These are reports about like this. I apologize, about three inches thick. And the bank goes through those every day, looking at every transaction. It's not just the line employees, it's the officers. As to the risk assessment form, what happened there is the bank undertook to implement the recommendation made by the FDIC. It revised the form. It attempted to automate the form. It attempted to make it better. At the end of the day, the customer risk assessment form was satisfactory to the bank's independent examiner, Joan Vivaldo, and the bank was satisfied that it would achieve the recommendations from the FDIC. The FDIC came in and disagreed, said, you know, you've done it this way. That really doesn't satisfy us. That doesn't mean there's a violation of the Bank Secrecy Act. As to the bank's, it looks like I'm running out of time, self-rating, the bank ultimately decided that it was a low-risk bank because it knew its customers so well. Let me just give you one example, and there's several, but I just want to see what you do with this example. It seems like it was in 2011, after being, I guess, told to revise the risk assessment form, Mr. Chi only identified one new customer as high risk. Correct. And he shifted the rating scale to make it easier to rate a new customer as low or medium risk. This seemed to be, you know, contrary to the recommendation in the FDIC's 2010 report. What's your response to that? I mean, and there are a number of these. I mean, this one happens to be under internal controls. Correct, Your Honor. The response to that is that most of the customers the bank had were longstanding customers. They'd been customers for years. They were borrowers. They were subject to extensive evaluation and review on a routine basis as the bank would renew credit. And so what Mr. Chi, the real distinction here is at what point does the fact this is a longstanding customer come into play? For some of the new customers that they didn't have before, they were rated high risk. And I seem to be out of time, Your Honor. Well, only one new customer was rated high risk. Correct, because that was the only new customer. The other customers, Dynasty, Wantech, they'd been customers for years. Wantech, since 1998. Okay. Thank you. Thank you very much. Mm-hmm. Good morning, Your Honors, and may it please the Court. I am Joseph Brooks from the FDIC's Appellate Litigation Unit. The question that was asked in the opening brief by my friend on the other side is, what happened between 2010's exam and 2012's exam? And the answer is a lot, and I think taking a quick look at it answers a lot of the questions that may have been raised by this case. The first thing that happened, of course, is that there were three corrective actions that were not only recommended by the FDIC in order for the bank's compliance plan to be in compliance, but were agreed to, were agreed to be done by the bank. However, none of those were done. The corrective risk ratings, the overall risk assessment, the account monitoring over time, and importantly, as to each one of these, under 12 U.S.C. Section 1818 S.3, the FDIC was required to seek and obtain a C&D order. Critically, as to these three, there's no fair notice issue. There's no bias issue. There's no misuse of the FFIEC manual. Moving along, we have the failure to document information and collect information for the deposit accounts. And the response to that is, well, the information was in the loan file. This is what I think is commonly recognized as a dog ate my homework argument. However, the evidence is clear in this case. The dog didn't eat the homework. What happened here is that, first of all, despite the claims of my brother to the opposite, the evidence was clear, the preponderance of evidence was found by the ALJ, that the existence of these loan files, or the fact that they had the information missing from the deposit files, was not communicated to the FDIC examiners. And you can find that in the record at Volume 2, E420-21. More importantly, at the trial before the ALJ, the trial before the ALJ, Mr. Chee, the BSA administrator, brought loan files that were prepared just for the hearing. And even those loan files had information missing that was required to be in them. Beyond that, it is undisputed that the overwhelming majority of the loan files had no information at all about BSA site visits. And interestingly enough, the requirement that information be in the deposit files was stated in the bank's own BSA manual. Again, no issue about FFIEC manual, no issue about fair notice, no issue about bias. The independent testing deficiencies that came up after the first exam and before the second one. As pointed out in our brief, the audit report that was prepared by Ms. Frivaldo, the consultant auditor, was deficient in a number of respects, most prominently that it didn't even indicate whether the compliance plan was satisfactory. And more importantly, and you can go to the record at Volume 2, E34-35 on this, the ALJ found that the critical problem here was that Ms. Frivaldo was in a dual role. She was serving both as a consultant and an auditor, and there was a conflict there. You don't need the FFIEC manual to tell you that that's a conflict. Again, no bias, no due process issue. The next thing that happened is that not one, but three new BSA administrators were appointed after the first exam and before the second one. And the most recent appointment at the time of the exam was Mr. Alan Shee. And he was found to be unqualified. And critically, he wasn't found to be unqualified based on something in the FFIEC manual. The primary evidence, as conceded in the opening brief at 40, was the testimony of the bank's own consultant. And in addition to that, it was the conduct of the BSA administrator in changing the risk assessment form, in changing the overall risk form, in failing to aggregate accounts to view them, and in failing to make sure that the documents that belonged in the deposit files were there. A final thing that happened was that the training was found to be inadequate. But that was also a new development because the basis, the primary basis, for the training being inadequate was the inadequate trainer, the BSA administrator. There were also some other issues there. I won't trouble you with them. Wrong answers and tests and such. The bottom line is, there was nothing in this case that required use of the FFIEC manual. There is no principle or rule or practice that was imposed here on the bank by the FDIC in the course of this exam that is not also included in the bank's own FFIEC manual. And as I pointed out, most of these things are apparent anyway. Counsel, I'm curious about your reaction to this idea. You rely on Woodley and Magic Valley potato shippers for the concept that an agency manual can be used to clarify statutory obligations. In those situations, however, it's only one agency involved in putting that manual together. Here you have a collaborative effort with the FDIC, the Fed Board of Governors, several other federal and state agencies that put together the FFIEC. Given that, does it make a difference that this is an effort of lots of different agencies as opposed to one? I don't know why it would, Your Honor. If anything, I'd expect that the guidance would be better. I mean, a lot of these federal agencies act in a cooperative way. It's not like a panoply of federal agencies. These are all financial regulatory agencies. The Federal Reserve, for example, the FDIC, they both regulate banks. They just regulate different banks. They have different responsibilities. So I don't think that implicates it at all. But I go back to my earlier point. The FFIEC is largely irrelevant to this case, the FFIEC manual, because, again, the BSA manual, which, by the way, was prepared by the same Ms. Vivaldo we've been talking about, the BSA manual incorporates much of the FFIEC manual, but importantly incorporates all of the provisions that could conceivably even be at issue here. So I don't think that that would change the picture at all. And your reference to the, excuse me, the Woodley case, I mean, what's very interesting about that case is what this Court said about the Provider Reimbursement Manual, a hundreds of pages long manual that was at issue there. This Court said that even though the HCFA conceded that the regulation at issue there was, quote, susceptible to misinterpretation and to subjective decisions, unquote, this Court rejected a vagueness challenge because fair notice was given by, quote, the regulations, the case law, and the Provider Reimbursement Manual. Our point here is a simple one. We're not saying that because there was a manual, everything is fine. What we're saying is the reliance on the manual cannot in and of itself, as has been alleged, be a violation of due process. And we say that because this Court, when it has looked at the existence of these manuals, has consistently found that it is a factor that mitigates against finding vagueness. And what's absent from anything that's been submitted to this Court and anything, quite frankly, that we've seen is any case that even suggests, let alone holds, otherwise. The only other issue is with respect to the suspicious activity reports. We'd largely rely on the brief for that because there are sensitive matters, but if the Court has any questions, I'd be happy to respond to them. And if the Court has any questions about any other aspects of the case, I'd be happy to respond to them. I do have one question, if I may. Is there any established precedent that addresses, in the context of the substantial evidence test, the significance of a bank not following advice from the on-the-scene regulators for advice in a prior report or not living up to something they'd earlier agreed to do? Your Honor, I haven't seen any case like that. The closest thing that I've seen in the course of working on this case, of course, that issue wasn't directly raised, although it's an interesting issue. The closest thing I've seen is the Magic Valley Potato case. And in that case, the Court found that the regulation about whether potatoes should or shouldn't be rated U.S. No. 1, the regulation itself certainly was important, but the Court found there were two other factors that were important in support of this Court's holding that there was fair notice there. One was the existence of an instructional manual, and the second was a presentation that was made, an information that was communicated to the potato shipper during a plant visit. That case is just like this case in the sense that you had, A, an instructional manual there like we have here, and, B, that instructional manual was an instruction manual for the examiners and inspectors at the potato plant. The FFIEC manual here similarly is a manual for conducting examinations. And in Magic Valley Potato, the combination of the manual and the information that was communicated to the plant operators, to the plant's president during a visit by the Department of Agriculture's inspectors, that information was found also critical by this Court in terms of communicating what was required. And what subsequently happened was, notwithstanding the fact that the inspectors who had visited the plant said, based on this instructional manual, based on how we interpret and apply it, these potatoes are not U.S. No. 1, they went forward and shipped them anyway, and this Court said their vagueness challenge did not save them from the penalties that were assessed. And that's about the closest thing I've seen to the question Your Honor has asked. Okay. Thank you. Unless the Court has further questions, I would simply request that the C&D order be affirmed in all respects. Thank you. Thank you for your time, Your Honor. Thank you, Your Honor. Once again, I begin by inviting the Court to ask any questions it may have. I may also be out of time, but I'm happy to stay here and answer questions. If there's no more questions, then thank you very much. Okay. I could rebut a lot of what he said, but I think I'm out of time. Thank you very much. Thank you very much. I appreciate it. That is the last case. So the case of California Pacific Bank v. FDIC is now submitted. Mr. Powell, Mr. Brooks, thank you very much for your arguments today. We are adjourned.
judges: Gould, Murguia, Gritzner